**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

POPPLETON NOW COMMUNITY
ASSOCIATION, INC., *et al.*,

     *Plaintiffs*,

  v.

LA CITE DEVELOPMENT, LLC, *et al.*,

     *Defendant*

Case No. 24-cv-2420-ABA

**MEMORANDUM OPINION**

This case is about the development (or lack thereof) of the Poppleton neighborhood in Baltimore over the past two decades. In 2006, the Mayor and City Council of Baltimore and a developer, Poppleton Development I, LLC, entered into a Land Disposition and Development Agreement ("LDDA" or "the Agreement") to develop 13.8 acres of land—much of which the City would need to acquire through eminent domain—into more than 1,600 housing units and 100,000 square feet of new commercial retail space. Since the LDDA's commencement, the project has experienced significant delays and complications, including multiple lawsuits and disputes between the parties to the Agreement.

Plaintiffs in this case are six Poppleton residents and a non-profit organization. They have sued various individuals and entities involved in the genesis and implementation of the LDDA, including the developers and several former and current Baltimore public officials. Plaintiffs allege that the LDDA constitutes an unconstitutional taking and violates their rights to equal protection and due process. They also allege claims of a private nuisance and unjust enrichment. Plaintiffs also

challenge Baltimore City's land use practices generally as violations of equal protection and due process. Each of the defendants has filed a motion to dismiss. For the reasons stated below, the Court will grant Defendants' motions to dismiss.

## I.    BACKGROUND

As noted above, the history of Poppleton Development I, LLC and related corporate entities' involvement in the Poppleton neighborhood has been ongoing for over two decades and is protracted and fraught.[1] The factual background below is focused on the discrete issues presented in this case.

### A.    The Parties

Plaintiff Poppleton Now Community Association ("Poppleton Now") is a non-profit corporation that describes itself as focused on "bettering the Poppleton neighborhood and advocating for the rights and desired uses of current and former neighbors." ECF No. 1 ¶ 41. The complaint states that the majority of the organization's members are Black, but does not state where its members live or lived (*e.g.*, if any of the organization's members once lived within the LDDA area). *Id.*

Plaintiffs Curtis Eaddy, Sonia Eaddy, Sterling Walker, Francina Walker, Yvonne Gunn, and Skip Gunn (collectively, "Individual Plaintiffs") are Poppleton residents who live adjacent to the LDDA area; none of them owns property that remains part of the LDDA or otherwise was taken by eminent domain. *Id.* ¶¶ 42-44. The Eaddys' property was formerly a part of the eminent domain proceedings associated with this project, but

---

[1] *See, e.g.*, ECF No. 1-2 (*Baltimore Banner* article describing the history of La Cité's involvement in the Poppleton neighborhood).

the city voluntarily withdrew it from those proceedings in 2022. *Id.* ¶ 42; *see also* ECF No. 30-1 at 6.

Defendant La Cité Development is a New York corporation with several subsidiaries that do business in Maryland. *Id.* at ¶ 47. Defendants La Cité, LLC, Poppleton Development I, LLC and PSH 1B, LLC are subsidiaries of La Cité Development. *Id.* ¶¶ 35-37. Defendant Dan Blythewood Jr. is the principal officer of these entities. *Id.* ¶ 38. These defendants are collectively referred to herein as the "Developer Defendants."

Defendants Brandon Scott (Mayor of Baltimore), Alice Kennedy (Director of Baltimore's Department of Housing and Community Development), and the City Council of Baltimore are collectively referred to herein as the "City Defendants." *Id.* ¶¶ 30-32.

Defendant Housing Authority of Baltimore City ("HABC"), as described by Plaintiffs, "was an agency within Baltimore City government until 2017" and is, at least according to Plaintiffs, a "governmental corporate body in the State of Maryland." *Id.* ¶ 33.[2] Defendant Janet Abrahams is HABC's President and CEO. *Id.* ¶ 34. These defendants are collectively referred to herein as "HABC Defendants."

Defendant Sheila Dixon ("Defendant Dixon" or "Ms. Dixon") is a former mayor of Baltimore and former City Council President. *Id.* ¶ 39.

---

[2] HABC Defendants argue that the characterization of HABC as a city agency is not correct, and state that "the *sole* legal affiliation between HABC and the City of Baltimore" is a cooperative agreement that allows the U.S. Department of Housing and Urban Development to provide federal loans for low-income housing. ECF No. 32-1 at 8-9 (citing 42 U.S.C. § 1437c(e)(2)).

### B.    Factual Background[3]

Since 1975, part of the Poppleton neighborhood has been designated as the Poppleton Urban Renewal Area ("Poppleton URP"). ECF No. 1 at ¶ 69.  In 2003, Developer Defendants approached the City about developing the Poppleton URP. *Id.* at ¶ 70. In July 2004, a Review Panel and the Office of Asset Management and Disposition (the "Review Panel") issued a Request for Qualifications (RFQ)[4] to redevelop a 13.8 acre site within the Poppleton URP.[5] *Id.* ¶ 73. Five developers, including La Cité, responded to the RFQ. *Id.* ¶ 74. Two entities were deemed non-competitive and the list was narrowed to three developers. *Id.* ¶ 75; ECF No. 1-3 at 2-3. The Review Panel gave Pennrose Properties an average score of 87 and all five voting members ranked it in first place. ECF No. 1 ¶ 77; ECF No. 1-3 at 3. The Review Panel gave La Cité an average score of 73 and ranked it third out of the three remaining bidders. ECF No. 1 ¶ 80; ECF No. 1-3 at 3. Based on this ranking and survey feedback from community meeting attendees who ranked Pennrose Properties, LLC as their top choice, ECF No. 1-3 at 2, on February 23, 2005, the Review Panel and the Office of Asset Management and Disposition

---

[3] At the pleadings stage, the Court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). The facts in this section, therefore, are drawn from the allegations in the Plaintiffs' complaint. The complaint sometimes uses terms such as "the City" and "the Developer" without identifying specific defendants; when referring to such facts, this section uses those same terms.

[4] Plaintiffs describe this as a Request for Proposals, or RFP, but documents that Plaintiffs attached to their complaint indicate this was a Request for Qualifications. *See* ECF No. 1-3.

[5] It appears that the 13.8 acres includes property within both the Poppleton Urban Renewal Area and an area called the Franklin Square Urban Renewal Area. *See* ECF No. 1-5 at 5 (describing the "Project Area" in the LDDA as "certain propert[ies]" within both Renewal Areas).

("OAMD") recommended that the city award the "right to plan and develop" the Poppleton Housing Site to Pennrose Properties. ECF No. 1 ¶¶ 75-76; ECF No. 1-3 at 2.

In March 2005, an article featuring City Council President Sheila Dixon ran in the magazine *Essence*. *Id*. ¶ 83; *see also* ECF No. 1-2 at 12. Plaintiffs state that La Cité and an investor in the Poppleton development associated with the magazine arranged this feature, and also provided Ms. Dixon a "spa day in the Hamptons." ECF No. 1 ¶ 82.

On March 16, 2005, OAMD issued a memo recommending that the city award the right to redevelop the Poppleton Housing Site to La Cité. *Id*. at ¶ 83; ECF No. 1-4. The memo noted that "[w]hile the La *Cite* team has weaknesses that were reflected in the scoring by the Review Panel," the scoring was low because the fact that the "strong, experienced lead developer" WestPac would be involved "was not made clear to the Review Panel." ECF No. 1-4 at 2. The development rights were awarded to "the development team of La Cite Development and WestPac, which [] formed the entity Poppleton Development I, LLC." ECF No. 1-5 at 3. Plaintiffs characterize the awarding of the RFQ as "suspicious" in light of the benefits that Ms. Dixon allegedly received from individuals affiliated with La Cité. ECF No. 1 at 22.

In 2006, Baltimore City entered into the Land Disposition and Development Agreement with Poppleton Development I, LLC. ECF No. 1 ¶ 85; ECF No. 1-5. The LDDA included four phases, "all of which [were] required to be completed by 2013." ECF No. 1 ¶ 87. The LDDA stated that the City owned or "w[ould] soon have in title" 358 of the 525 properties in the area and it would "use its authority through the Poppleton [URP] to acquire" the remaining 167 properties. ECF No. 1-5 at 3. Plaintiffs allege that the LDDA timeline was unreasonable, and that the properties' alleged taking for "public use was inconceivable from inception." ECF No. 1 ¶ 91.

In 2013, following litigation in which the developers alleged that Baltimore had failed to acquire enough property through eminent domain, the LDDA parties agreed to amend the Agreement. ECF No. 1 ¶¶ 92-93. The amended agreement changed the timing for each phase (for example, phase 1 was dividing into subphases of 1A, 1B, and 1C, and discussions to revise the LDDA to would begin no earlier than closing on phase 1B), "removed 2013 as the end date for the project," but "failed to replace it with a new end date." *Id.* ¶¶ 96, 97; *see also* ECF No. 1-6 (First Amendment to the LDDA). Plaintiffs describe the amendment as "confer[ing] an indefinite and perpetual private property 'right'" on the Developer "over all 13.8 acres and across all four phases." ECF No. 1 ¶ 97. Since 2013, the parties to the LDDA have amended the Agreement five times, each of which has extended project deadlines. *Id.* ¶ 99. Plaintiffs allege that the "initial vague concept" of the LDDA and the many subsequent changes to it demonstrate that "the LDDA was always more about a private property transfer than about executing a public plan." *Id.* ¶ 95.

Plaintiffs also challenge two specific payments from the City and HABC to Developer Defendants. The first challenged payment relates to Plaintiff Ms. Eaddy's house, which was located within the original LDDA area. ECF No. 1 ¶ 42. The state filed to take Ms. Eaddy's property through eminent domain, a proceeding she challenged in state court. ECF No. 1 ¶ 103. While the case was on appeal, the City voluntarily chose to remove her home and several neighboring rowhouses from the LDDA area. ECF No. 1 ¶ 103; *see also* ECF No. 30-1 at 6 (City Defendants' statement that "[w]hile the Eaddys once had their home listed for eminent domain, the City voluntarily withdr[e]w the Eaddys property from that list"). In July 2022, the City paid the Developer $260,000 (the market value the City would have paid Ms. Eaddy had it completed the eminent

domain action) to remove Ms. Eaddy's home and another parcel she owned from the LDDA area. ECF No. 1 ¶ 104; *see also* ECF No. 1-10. This revision to the LDDA area is reflected in the Fifth Amendment to the LDDA. ECF No. 1 ¶¶ 100, 104.

The second challenged payment involves the City's Transform Poe Redevelopment Project ("Poe Project"). *Id*. ¶¶ 105-08.[6] In August 2023, HABC paid $550,000 to the Developer for the development rights with respect to three parcels located within the Poppleton Housing Site that the City wanted as part of the Poe Project. *Id*. ¶¶ 106, 107. Plaintiffs maintain that the new project "constituted a material change of the public use for properties acquired by eminent domain" and that because the City already owned these properties, "both payments (the $260,000 and the $550,000) . . . are the property of the City of Baltimore and must be paid-back." *Id*. ¶¶ 108, 112.

C.    **Procedural History**

Plaintiffs filed their complaint in August 2024 with five counts: a violation of the Takings Clause (count 1); a violation of the Equal Protection and Due Process Clauses (count 2); a violation of the Equal Protection and Due Process Clauses based on Baltimore's land use practices (count 3, alleged against Baltimore City only); private nuisance (count 4); unjust enrichment (count 5).[7] Plaintiffs seek damages, injunctive relief, and a declaratory judgment (including a declaration that the LDDA "is void"). *Id*. at 58, 63.

---

[6] The Poe Project is a planned redevelopment of the Edgar Allan Poe Public Housing Complex, which is close to the Poppleton Housing Site. ECF No. 1 ¶ 22.

[7] The numbering of the counts in the complaint is not sequential. For clarity, the court will use these count numbers throughout the opinion.

All Defendants have filed motions to dismiss. *See* ECF Nos. 12 & 13 (Developer Defendants); ECF No. 27 (Defendant Dixon); ECF Nos. 30 & 31 (City Defendants); ECF No. 32 (HABC Defendants). Plaintiffs filed opposition briefs to each motion. *See* ECF No. 22 & 23 (opposition to Developer Defendants' motions); ECF No. 38 (oppositions to Defendant Dixon's motion); ECF Nos. 36 & 37 (opposition to City Defendants' motions); ECF No. 42 (opposition to HABC Defendants' motion). And Defendants filed reply briefs for each motion. *See* ECF Nos. 25 & 26 (Developer Defendants); ECF No. 39 (Defendant Dixon); ECF Nos. 40 & 41 (City Defendants); ECF No. 43 (HABC Defendants).

In addition, the Developer Defendants filed a motion for sanctions against the Plaintiffs, seeking dismissal of the complaint with prejudice and reasonable attorney's fees and costs in defending the action. ECF No. 18; *id*. at 11.

## II.    STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a defendant asserts that, even assuming the truth of the alleged facts, the complaint fails "to state a claim upon which relief can be granted," the defendant may move to dismiss the complaint. Fed. R. Civ. P. 12(b)(6). As noted above, in considering such a motion, the Court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King*, 825 F.3d at 212. A motion under Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).

When a defendant moves to dismiss for lack of subject matter jurisdiction under
Federal Rule of Civil Procedure 12(b)(1), "[t]he plaintiff has the burden of proving that
subject matter jurisdiction exists." *Evans v. B.F. Perkins Co., a Div. of Standex Int'l
Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). "The district court should grant the Rule
12(b)(1) motion to dismiss 'only if the material jurisdictional facts are not in dispute and
the moving party is entitled to prevail as a matter of law.'" *Id.* (quoting *Richmond,
Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).

## III.    DISCUSSION

City Defendants and Developer Defendants argue that the complaint fails for lack
of standing and failure to state a claim. *See* ECF Nos. 12, 31 (motions to dismiss under
Fed. R. Civ. P. 12(b)(1), for lack of standing); ECF Nos. 13, 30 (motions to dismiss under
Fed. R. Civ. P. 12(b)(6), for failure to state a claim). And although HABC Defendants and
Defendant Dixon do not raise 12(b)(1) standing arguments, the Court may consider
standing issues as to all defendants because "[i]f the court determines at any time that it
lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P.
12(h)(3). As discussed below, some counts fail for a lack of standing, some fail for a
failure to state a claim, and some fail for both reasons. The Court begins with an
overview of standing doctrine before considering each count.

### A.    Standing

Under Article III, jurisdiction over a "case or controversy" requires (among other
things) that at least one plaintiff has standing to sue. *See Murthy v. Missouri*, 603 U.S.
43, 56-57 (2024) ("The case or controversy requirement is fundamental to the
judiciary's proper role in our system of government.") (internal quotations omitted).
There are three required elements to establish standing: (1) an injury in fact that is

concrete and particularized; (2) a causal connection between the injury and the allegedly wrongful conduct; and (3) redressability (i.e., a likelihood that the injury will be redressed by a favorable outcome in the case). *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (referring to these three elements as an "irreducible constitutional minimum"). Because a plaintiff may have standing to recover for one claim, but lack standing for another—even when the claims involve related facts—the question of standing must be determined on a claim-by-claim basis. *See Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) ("Our standing decisions make clear that 'standing is not dispensed in gross.'") (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). But as to each claim, "the presence of one party with standing is sufficient." *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

With respect to the first element, standing requires a "concrete and particularized" injury, which is something more than a "generalized grievance[] about the conduct of government." *United States v. Richardson*, 418 U.S. 166, 174 (1974) (quoting *Flast v. Cohen*, 392 U.S. 83, 106 (1968)). A "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1.

Plaintiffs must next demonstrate that there is a causal connection between their alleged injuries and the alleged wrongdoing. *See Lujan*, 504 U.S. at 560. The alleged injury must be one "that fairly can be traced to the challenged action of the defendant" rather than "the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). The burden of establishing causation for standing purposes is "relatively modest" at the pleadings stage. *DiCocco v.*

*Garland*, 52 F. 4th 588, 592 (4th Cir. 2022) (quoting *Bennett v. Spear*, 520 U.S. 154, 171 (1997)).

Finally, Plaintiffs must demonstrate that their injury "likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). The requirements of causation and redressability "are often flip sides of the same coin" because "[i]f a defendant's action causes an injury," an injunction or damages "will typically redress that injury." *Id.* at 380-81 (internal quotations omitted).

A plaintiff that is an organization—such as here, Poppleton Now—may establish standing based on its own injury or based on its members' injuries, the latter of which is often called representational or associational standing. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). To establish representational standing, "an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). Only one identified member of the organization needs to establish injury to support associational standing. *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).

Although Plaintiffs note many non-concrete grievances related to the Defendants' actions,[8] their allegations of injury fall within four general categories: (1) the award of 13.8 acres of property within the Poppleton Housing Site to Developer Defendants, some of which was obtained through eminent domain, ECF No. 1 at 4; (2) destruction of Plaintiff's property values, *id.*; (3) the loss of their use and enjoyment of their land, *id.*; and (4) the "denial of meaningful opportunities to participate or gain market value or amenities through natural market forces," *id.* ¶ 175.

Here, the fourth category of harm is essentially a complaint that the Defendants' activities (or inactivity) within the Poppleton Housing Site area has disrupted "natural market forces," which has denied Plaintiffs "meaningful opportunities . . . to gain market value." 45. This injury is too conjectural to support standing. *See Lujan*, 504 U.S. at 560 (for standing purposes, an injury must be "concrete" and "actual or imminent," as opposed to "conjectural or hypothetical") (internal quotations omitted). Plaintiffs' beliefs about what might have happened to their property values or neighborhood amenities based on so-called "natural market forces" are too speculative to establish standing. These alleged injuries are also not "particularized"; that is, Plaintiffs have not asserted that the alleged disruption in market forces has affected them in "a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. For these reasons, the Court will not consider this alleged injury. The three remaining categories of alleged injury will be considered in the analysis below.

---

[8] *See, e.g.*, ECF No. 1 ¶ 197 ("Defendants . . . destroyed people's lives"), *id.* ¶ 26 (noting "devastation wrought by the LDDA and the Developer's improper actions"), *id.* ¶ 140 ("As a direct and proximate result of [Defendants'] Unconstitutional actions, the Plaintiffs . . . live in a vacated wasteland left behind by this project."), *id.* ¶ 98 ("broken promises" by the developer "caused great harm").

### B.    Plaintiffs have not alleged sufficient facts to state a claim against Defendant Dixon

Before diving into each of the individual causes of action, the Court considers the claims against Defendant Dixon,[9] who seeks dismissal of the claims against her on statute of limitations grounds. ECF No. 27 ¶ 4. Plaintiffs contend that the "harm set in motion by Ms. Dixon" began with the signing of the LDDA and "continues to this day." ECF No. 38 at 1. They also alternatively argue their claims are timely because certain aspects of Ms. Dixon's involvement in the LDDA "only recently came to light." *Id.* at 2. Ms. Dixon also argues that Plaintiffs have failed to state a claim for which relief can be granted. ECF No. 27 ¶ 5.

Plaintiffs have failed to adequately state any claim against Ms. Dixon. Plaintiffs do not allege that she took any actions that gave rise to any of the four claims they raise against her. The complaint alleges that Ms. Dixon received "a full-day of makeovers and a spread in Essence Magazine that touted her community redevelopment prowess," arranged by the Developer, ECF No. 1 ¶ 13; *see also id.* ¶ 82 (alleging that Ms. Dixon was also provided a "spa day"), and "acted in concert with [Defendant] Blythewood to deny Plaintiffs their Constitutional rights," *id.* ¶ 39.

Though "a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim," the complaint "must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain

---

[9] The only count that Plaintiffs appear to exclude Defendant Dixon from is count 3, which they bring against "Baltimore City [o]nly." ECF No. 1 at 43. The Court therefore will treat the complaint as raising counts 1, 2, 4, and 5 against Ms. Dixon.

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") (citation omitted). Here, although Plaintiffs characterize the timing of the *Essence* spread as "nothing short of extraordinary," ECF No. 1 ¶ 14, and the RFQ award as "suspicious," *id.* at 22, they do not allege that any of Ms. Dixon's actions support any of the claims in their complaint. That is, they do not allege, even upon information and belief, that Ms. Dixon influenced or attempted to influence the Review Panel's recommendation, or that any such influence would be a constitutional violation. Absent any other factual allegations, Ms. Dixon's alleged spa day, makeover, and magazine spread arranged by the Developer do not constitute a violation of the Takings Clause, the Equal Protection Clause, or the Due Process Clause. Those allegations about the magazine spread also do not support claims for private nuisance or unjust enrichment. The remaining allegation against Ms. Dixon—that she acted "to deny Plaintiffs their Constitutional rights"—is conclusory. *See Twombly*, 550 U.S. at 555 ("a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions") (internal quotation marks omitted) (alteration in original).

While the Court at the pleadings stage must "draw all reasonable inferences" in Plaintiffs' favor, *King*, 825 F.3d at 212, it cannot fill in gaps with allegations that do not appear in the complaint. *See Martin v. Duffy*, 858 F.3d 239, 248 (4th Cir. 2017) (with motion to dismiss, court is not required to accept "unwarranted deductions of fact, or unreasonable inferences."). The complaint does not sufficiently plead any claims against

Ms. Dixon upon which relief can be granted. The counts against her will be dismissed under Rule 12(b)(6).[10]

### C.    Count 1 – Takings

The Fifth Amendment of the U.S. Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. None of the Plaintiffs here were owners of properties that were taken by eminent domain. But in Count 1, Plaintiffs allege that when the City exercised eminent domain to take some of their neighbors' properties pursuant to the LDDA, those exercises of eminent domain were unconstitutional because Defendants did not "ensur[e] the delivery of a public use" of the properties. *See, e.g.*, ECF No. 23 at 2. Defendants move to dismiss this claim for both a lack of standing and failure to state a claim.

As to standing, City Defendants and Developer Defendants argue that Plaintiffs have not established any of the three elements of standing, especially a particularized injury-in-fact. *See* ECF No. 31-1; ECF No. 12-1 at 22-28. They also argue that Plaintiffs have not stated a cognizable takings claim because Plaintiffs themselves have not had any property condemned by the government (*i.e.*, a direct taking), *see* ECF No. 30 at 7-8, ECF No. 13-1 at 20, and Plaintiffs also do not allege a *per se* or regulatory taking. *See* ECF No. 30 at 8-11; ECF No. 13-1 at 21-22. HABC Defendants add that because the complaint often refers to "Defendants" collectively, "Plaintiffs nowhere allege that HABC, expressly, itself, or Ms. Abrahams, individually, disseized Plaintiffs of their

---

[10] Because the Court dismisses the claims against Ms. Dixon on failure-to-state-a-claim grounds, it need not reach the alternative argument that any claims against Ms. Dixon are barred by the statute of limitations.

properties, controlled Plaintiffs' private properties, occupied Plaintiffs' properties, or transferred possession or control of their properties." *See* ECF No. 32-1 at 11-13.

The Court concludes that Plaintiffs' takings claim (count 1) fails because Plaintiffs have not alleged a cognizable injury in fact; the Court need not reach the other reasons Defendants contend count 1 should be dismissed. Plaintiffs say they have standing because Maryland law recognizes the adjacent or nearby property owners as a "subset of . . . *Lujan* standing." ECF No. 23 at 5. They also argue that the interest needed for standing "need only be slight" when the issues presented are of great public interest. *Id.* at 6 (quoting *Balt. Cnty. v. Churchill, Ltd.*, 271 Md. 1, 5 (1974)). Developer Defendants contend that Plaintiffs cannot establish any of the three elements of standing, and emphasize that "the connection between [] Defendants' actions and Plaintiffs' purported injuries is too tenuous" to support the causation requirement of standing. ECF No. 12-1 at 27; *see also* ECF No. 31-1 at 6-7, 11-13 (City Defendants' argument that Plaintiffs lack each element of standing as to their taking claim).

Plaintiffs' primary standing argument is based on a type of standing termed "property owner standing" that is recognized under Maryland law in limited circumstances. ECF No. 23 at 5-8; s*ee also Anne Arundel Cnty. v. Bell*, 442 Md. 539, 569 (2015) ("the doctrine of property owner standing may apply to administrative land use decisions and other land use actions undertaken as executive functions"). "Property owner standing" stems from Maryland zoning statutes, which grant an "aggrieved person" the right to challenge certain zoning actions. *Bell*, 442 Md. at 556 (citing *State Center, LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 522-23 (2014)).

But that is a state-law doctrine, and Plaintiffs have identified no authority for incorporating it into federal Article III standing doctrine. States can have their own

16

standing requirements that differ from federal standing requirements, and often do. *See, e.g.*, *Village of Arlington Heights*, 429 U.S. 252, 262 n.8 (1977) (dismissing petitioners' argument that respondent lacked standing, noting, "Illinois may choose to close its courts to [certain parties] unless they have an interest more direct than MHDC's, but this choice does not necessarily disqualify MHDC from seeking relief in federal courts for an asserted injury to its federal rights"); *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989) (explaining that "state courts are not bound to adhere to federal standing requirements," even when interpreting federal law). The fact that Maryland state courts confer standing, based on a state statute, on certain parties through property owner standing does not alter the "irreducible minimum requirements" of standing required under Article III of the U.S. Constitution. *See Lujan*, 504 U.S. at 560. *Cf. Bauer v. Elrich*, 8 F.4th 291, 298 (2021) ("Maryland taxpayer standing doctrine . . . merely *confers standing in state court* for taxpayers to enforce a right or obligation imposed by some other provision of law.") (emphasis added).

Focusing on the elements of Article III standing, Plaintiffs have not alleged an actual, particularized injury sufficient to establish standing for their takings claim. As noted above, the Takings Clause of the U.S. Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. Individual Plaintiffs here all maintain ownership over their properties and, therefore, do not contend that any of their properties have been taken for public use.[11] The fact that

---

[11] As noted above, Ms. Eaddy's property was originally identified for condemnation, but the City later removed her property from the LDDA area. ECF No. 1 ¶ 103. The Eaddys specifically note that they "do not claim any damages as a result of her home having been listed by the city for eminent domain, then removed by the City." *Id.* ¶ 42.

the Individual Plaintiffs' *neighbors* had their properties taken through eminent domain does not constitute an actual injury to *Plaintiffs* that would permit these Plaintiffs to challenge as unconstitutional the takings of their former neighbors' properties. These Plaintiffs do not have standing to retroactively challenge their neighbors' eminent domain transactions.

Likewise, Poppleton Now does not allege that any of its members had their properties taken. *See* ECF No. 1 ¶ 148 (stating that the organization "advocates for the rights of . . . past tenants of the Poppleton neighborhood (whose homes were taken)," but failing to identify any members who have had their homes taken for public use).[12]

For these reasons, Count 1 will be dismissed for lack of standing. Because Plaintiffs have not established standing, the Court cannot and will not consider whether Plaintiffs have stated claims on which relief can be granted.

### D.    Count 2 – Equal Protection and Due Process

Next Plaintiffs allege equal protection and due process violations under 42 U.S.C. § 1983, as well as comparable violations under the Maryland constitution. The equal protection and due process analyses are generally the same under the Maryland and federal constitutions. *See Tyler v. City of College Park*, 415 Md. 475, 499 (2010) ("[A]s a general rule, we interpret Article 24 *in pari materia* with the Fourteenth Amendment to the United States Constitution.").

---

[12] The Court does not decide at this time whether, if one or more members of Poppleton Now were among those whose properties were subject to eminent domain, the organization could establish standing to challenge those takings. Such a claim may very well run afoul of the requirement of associational standing that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions*, 600 U.S. at 199 (quoting *Hunt*, 432 U.S. at 343).

### i.    Equal protection

Plaintiffs contend that the LDDA unconstitutionally transferred private property from Black individuals to a "political-favored ally" at a "preferential price, without any real obligation that [Developer Defendants] perform." ECF No. 1 ¶¶ 151-52. Plaintiff alleges that Developer Defendants targeted the Poppleton neighborhood because it was an "underprivileged and minority community" and argue that the LDDA and related property transfers were "only possible" because the activities took place in a "poor and underprivileged neighborhood." *Id.* ¶ 153. Plaintiffs also allege that City Defendants paid Developer Defendants "for the value of property taken from black homeowners that is required to be held in the public trust." *Id.* ¶ 160. Defendants argue this claim should be dismissed because Plaintiffs have not (1) alleged any "specific violation of legally protected rights," ECF No. 13-1 at 16; (2) identified a similarly situated comparator who has been treated differently, ECF No. 30-1 at 16; or (3) alleged facts establishing purposeful discrimination, ECF No. 32 at 15-16.

To make out an equal protection claim, "a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011); *see also Vill. of Arlington Heights v. Metro. Hous. Dev.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.").

Here, Plaintiffs have not made out an equal protection claim because, to the extent they have alleged discriminatory animus, those allegations are conclusory. *See Iqbal*, 556 U.S. at 678. Plaintiffs maintain throughout their complaint that the

Poppleton neighborhood was targeted because the residents of the neighborhood were predominantly Black. *See, e.g.*, ECF No. 1 ¶ 145 ("Poppleton was targeted by this Developer for private interests because it was an underprivileged and minority community, yet had potential future market value due to its proximity to the University of Maryland Medical Center."); *id.* ¶ 154 ("Developer targeted a historically minority/underprivileged community near certain amenities with potential future market value (like the Medical Center) and already subject to an old URP, and then began an extended campaign of influence over elected officials to take 13.5 acres and give them to him."); *id* ¶ 22 ("The LDDA and associated URP . . . is an impermissible zoning practice under the equal protection clause (particularly when directed at a black community . . .).").

Although these statements allege that Poppleton was "targeted" because of the residents' race, they do nothing more to allege that Defendants' decisions were motivated by racial animus or discriminatory purpose. *See, e.g.*, *Sheppard v. Visitors of Va. State Univ.,* 993 F.3d 230, 238 (4th Cir. 2021) (dismissing an equal protection claim because plaintiff relied only on an allegation that a university administrator's actions were "because of his male gender" without "any specific allegations that [the administrator] was motivated by discriminatory animus"). In fact, Plaintiffs themselves note that there are other reasons why the Poppleton neighborhood would be an attractive location for development, including its proximity to "certain amenities," ECF No. 1 ¶ 154, suggesting a motivation other than racial animus. "[P]leadings that . . . are no more than conclusions[] are not entitled to the assumption of truth" at the pleadings stage. *Iqbal*, 556 U.S. at 679. Simply put, discriminatory animus is a necessary element of an equal protection claim, and Plaintiffs have not sufficiently alleged it here.

Therefore, Count 2 does not state an equal protection claim on which relief can be granted.

### ii.    Due process

Plaintiffs' due process claim is based on the premise that the exercise of eminent domain "for a use that is not imbued with a public interest is such a violation of the basic and essential features of constitutional government that it amounts to a taking without due process of law." ECF No. 1 ¶ 63 (quoting *High Ridge Ass'n, Inc. v. Cnty. Comm'rs of Carroll Cnty., Md.*, 105 Md. App. 423 (1995)).  Plaintiffs also clarify in their opposition brief that their due process claim includes their allegations that Defendants "bypassed procedural guardrails." ECF No. 22 at 9. Specifically, they contend that state law requires the government to "re-establish eminent domain authority every four years" under a so-called "lookback law." *See, e.g.*, ECF No. 1 ¶¶ 98, 135, 176 (citing Md. Code Ann., Real Property Art., § 12-105.1). Because these claims are based on alleged deprivation without appropriate procedural protections, the Court interprets Plaintiffs' claim as a procedural due process claim.

Defendants contend (1) the complaint fails to establish state deprivation of a cognizable property interest, ECF No. 13 at 25-26, ECF No. 30-1 at 15-16, and (2) to the extent Plaintiffs have alleged a reduction in property values, "[n]o property owner has a legal entitlement, grounded in an independent source such as state law, to rising property values." ECF No. 30 at 16.

To bring a procedural due process claim, Plaintiffs must identify "a cognizable property or liberty interest and a deprivation without due process." *Sheppard*, 993 F.3d at 239. For a property interest to be protected by procedural due process, a plaintiff "must have more than an abstract need or desire for it [or] a unilateral expectation of it.

He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

Plaintiffs' main contention is that a government taking that is not for the public interest amounts to a taking without due process. *See* ECF No. 1 ¶ 63. That reasoning, however, is based on dicta from the Appellate Court of Maryland's *High Ridge Ass'n, Inc.* opinion, which was subsequently reversed by the Supreme Court of Maryland. *See Green v. High Ridge Ass'n*, 346 Md. 65 (1997). The Supreme Court of Maryland's opinion does not address the question of due process at all and, in fact, cautions that the decision of whether a particular condemnation is "necessary" is a question that should generally be left to the legislative and executive branches. *See Green*, 346 Md. at 79. Plaintiffs offer no other support for the argument that a taking not for the public interest is *inherently* a due process violation. The Court, therefore, must apply the typical analysis and consider whether Plaintiffs have alleged a deprivation of any constitutionally protected property or liberty interest.

Here, none of the Plaintiffs' alleged injuries constitute a specific liberty or property interest protected by due process. For example, Plaintiffs allege that their property values have fallen as a result of the LDDA. *See* ECF No. 1 ¶ 140. But property owners do not have a "legitimate claim of entitlement" to rising or even stable property values. *Roth*, 408 U.S. at 577; *see Ancarrow v. City of Richmond*, 600 F.2d 443, 447 (4th Cir. 1979) (explaining that the Fourteenth Amendment "does not protect the owner from fluctuations in the value of his property resulting from governmental decisions to put neighboring public property to a lawful, albeit unattractive, use"). To be sure, a party who has lost "*all* economically beneficial uses" of their property can allege a regulatory taking, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992), but here Plaintiffs

have expressly disclaimed any regulatory takings claim, which in any event would be different from the vague allegations of lowered property values made in this case. *See* ECF No. 36 at 7 (Plaintiffs' statement that "do not allege a regulatory or *per se* taking").[13]

### E.    Count 3 – Equal Protection and Due Process – Baltimore City's Land Use Practices

Along with their claims challenging the creation and implementation of the LDDA, Plaintiffs also allege that Baltimore's land use practices—including Urban Renewal Plans, land banking, the use of separate corporate entities to undertake governmental functions, alleged spot-zoning, and a practice called "conditional use by ordinance"—violate their equal protection and due process rights under the federal and Maryland constitutions. ECF No. 1 ¶¶ 172, 176. Plaintiffs note that although nearby Baltimore County engages in "comprehensive rezoning" every four years, Baltimore City "lacks the process" of other Maryland counties because it rezones only every forty years. *Id.* ¶ 166. Plaintiffs also point to Baltimore City's legacy of redlining and contend that "deep racial biases and constitutional infirmities remain written into the Baltimore City Zoning Code." *Id.* ¶¶ 164, 167-68.

City Defendants argue that Plaintiffs lack standing for this claim, characterizing the complaint as "broad and generalized" and noting that Plaintiffs do not draw a connection between the complained-of land use practices and their own alleged injuries. ECF No. 31 at 2. City Defendants also contend that, even if Plaintiffs could establish

---

[13] Because Plaintiffs have not pled a cognizable deprivation of a protected liberty or property interest, the Court need not and does not decide whether the government followed the procedures that Plaintiffs allege were required under section 12-105.1 of the Real Property Article of the Maryland Code. *See* ECF No. 1 ¶ 135.

standing, Plaintiffs have not stated a claim because they have not alleged that any of the land practices they challenge have been applied to them. *See* ECF No. 30 at 17 ("Plaintiffs at best allege that they have been indirectly affected as a result of living nearby to individuals, who are not parties to this case, who have allegedly been affected by these practices.").

Plaintiffs' broad-based challenge to Baltimore City's zoning practices fails for lack of standing. First, Plaintiffs have not identified a concrete, particularized injury that they have experienced in connection with the alleged constitutional violations. *See Lujan*, 504 U.S. at 560. The complaint broadly alleges wrongs that Plaintiffs contend result from the challenged zoning practices. *See, e.g.*, ECF No. 1 ¶ 169 (Baltimore's zoning practices "prevent[] the City from breaking down barriers that would afford equal opportunities to historically disadvantaged individuals"); *id.* ¶ 170 (historical zoning decisions have led to "vast residential zones without amenities, like grocery stores and other commercial uses"); *id.* ¶ 176 ("subdivisions are blocked routinely in white neighborhoods, like Mt. Vernon, but routinely allowed in black neighborhoods"). But Plaintiffs do not identify a non-hypothetical, particularized injury—that is, an injury that "affect[s] the plaintiff in a personal and individual way," *Lujan*, 504 U.S. at 560 n.1. As an example, Plaintiffs challenge the practice of Urban Renewal Plans as essentially a mechanism for illegal spot zoning and seek to "abolish" all URPs in Baltimore City "as unconstitutional vestiges of segregation." ECF No. 1 ¶ 176. But as to the Poppleton URP, Plaintiffs merely contend that the URP was what allowed the Developer to implement the LDDA and "[h]ad Poppleton also not been saddled with this URP, free market forces could have been permitted to take root in the neighborhood for the last twenty years, elevating the property values." *Id.* This type of injury is too conjectural and hypothetical

and not sufficiently particularized to establish standing. *See Lujan*, 504 U.S. at 560. Count 3 is essentially a catalogue of zoning practices that Plaintiffs believe cause harm and perpetuate injustices. However, generalized grievances of this type cannot support standing. *Lujan*, 504 U.S. at 573-74 ("a plaintiff raising only a generally available grievance about government . . . does not state an Article III case or controversy").

Finally, to the extent Plaintiffs *have* alleged injury under Count 3, they have not shown a causal link between their harm and City Defendants' challenged actions. The complaint identifies numerous actors who have contributed to the zoning realities of Baltimore, including "financing parties [who] continue to 'redline' Baltimore City," "politicians [who] routinely interject their arbitrary political interests into each land use decision," and "white flight." ECF No. 1 ¶ 175-76. Even recognizing that the bar to establish causation is "relatively modest" at the pleadings stage, *DiCocco*, 52 F. 4th at 592, Plaintiffs have not established that any injury they have experienced "fairly can be traced to the challenged action of the defendant, and not . . . the independent action of some third party not before the court." *Simon*, 426 U.S. at 41-42. This count will be dismissed for lack of standing. Because Plaintiffs have not established standing, the Court cannot and will not consider whether Plaintiffs have stated a claim on which relief can be granted.

### F.    Private Nuisance (Count 4)

As noted above, in Count 4 Plaintiffs allege that Defendants have created "nuisance conditions" in the neighborhood and that their "abandon[ment]" and underdevelopment of the LDDA area is a "substantial and unreasonable" use of their land. ECF No. 1 ¶¶ 139, 190, 191.

### i.   Plaintiffs have standing to bring a private nuisance claim against some Defendants

As an initial matter, Plaintiffs have standing to assert their private nuisance claim against the Developer and City Defendants (who own the properties that comprise the LDDA area), but not against the HABC Defendants.[14]

The injuries that Plaintiffs rely upon in Count 4 are an alleged reduction of their properties' market values and the loss of the use and enjoyment of their homes since 2007. *Id.* ¶ 192. Some of the specific injuries are related to issues in the neighborhood (*e.g.*, vacated homes, trash, weeds, and parking issues). *Id.* ¶ 98. Plaintiffs also have alleged *some* causal connection between their alleged injuries and Developer Defendants' actions (for example, that the parking issues in the neighborhood are caused by Developer Defendants' parking charges, *id.*) and City Defendants' actions (for example, that some of the complained-of neighborhood conditions came about after the City listed homes in the neighborhood for condemnation, *id.*). *See DiCocco*, 52 F. 4th at 592 (the burden to establish causation for standing purposes is "relatively modest" at the motion to dismiss stage). These injuries are, at least in theory, redressable. *See* ECF No. 1 at 63 (Plaintiffs' request for relief, including a financial judgment, to "abate ongoing nuisances"). Plaintiffs, therefore, have established standing to bring their

---

[14] Because Count 4 is a *private* nuisance claim, this claim does not implicate the special-injury doctrine applicable to public nuisance claims. *See, e.g.*, Restatement (Second) of Torts § 821C (1979); *Hoffman v. United Iron & Metal Co., Inc.*, 108 Md. App. 117, 135 (1996) (holding that a private person seeking to enjoin a public nuisance must show that he or she "has suffered from it some special and particular damage, different not merely in degree, but different in kind, from that experienced in common with other citizens") (quoting *Balt. & Ohio R.R. Co. v. Gilmor*, 125 Md. 610, 617 (1915)).

private nuisance claim against Developer Defendants and City Defendants (though that claim must be dismissed for failure to state a claim, for the reasons discussed below).

As to HABC, however, Plaintiffs lack standing for Count 4 because the complaint does not allege a connection between Plaintiffs' alleged private nuisance injuries and any actions by HABC. The allegations about HABC are focused on its $550,000 payment to Developer for three plots within the LDDA area, *id.* ¶¶ 106-08, along with general allegations that HABC's structure is used to "shield" the City's actions from "constitutional scrutiny." ECF No. 1 at 5. Plaintiffs have not shown even an attenuated causal connection between this payment and the injuries that they allege constitute private nuisances. Therefore, Plaintiffs have only established standing to bring this claim against City Defendants and Developer Defendants.

### ii.    Plaintiffs have not stated a private nuisance claim

Although Plaintiffs have standing for their nuisance claim, their alleged facts do not support a claim for private nuisance. Under Maryland law, private nuisance requires "an unreasonable and substantial interference" with the use and enjoyment of one's property. *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 409 (2013), *reconsidered in part on other grounds*, 433 Md. 502 (2013). Individual Plaintiffs argue that they have "lost the market value and use of enjoyment of their homes" due to the "deplorable conditions" caused by the LDDA and the fact that the LDDA has "block[ed] free market forces and new market entrants." ECF No. 1 ¶ 192. They specifically point to problems in the vacant area ("emptiness, vacated homes, demolished homes, rats, trash and all types of environmental nuisances," "tall grass and weeds"), embarrassment during family visits, a sense of fear from losing neighbors, and residents of the Poppleton apartment building that Developer Defendants constructed parking on the street. *Id.* ¶ 98.

Defendants argue that none of the alleged facts actually support substantial interference with Plaintiffs' use of their properties. *See, e.g.*, ECF No. 13-1 at 27 (arguing that of the many grievances in the complaint "none . . . impact Plaintiffs' use of their own property"); ECF No. 30-1 at 19 ("Plaintiffs here have not alleged *any* restriction on the use of their land, let alone a crippling one."). Developer Defendants also contend that "mere diminution of property value" on its own is not enough to establish a private nuisance. ECF No. 13-1 at 27.

Private nuisance is "a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Rosenblatt v. Exxon Co.*, 335 Md. 58, 80 (1994) (quoting Restatement (Second) of Torts § 821D (Am. Law Inst. 1965)). The disturbance of the property interest must be "substantial and unreasonable . . . such as would be offensive or inconvenient to the normal person." *Id.* at 125 (citing *Gorman v. Sabo*, 210 Md. 155, 159 (1956)). Actions that do not depreciate a property's market value may nonetheless constitute a nuisance based on the resulting discomfort and annoyance. *See Wash. Suburban Sanitary Comm'n v. CAE-Link Corp.*, 330 Md. 115, 125 (1993) (citing cases). But the inverse is not necessarily true; actions that depreciate a property's market value without an attendant disturbance of the property's use and enjoyment is not enough to constitute a private nuisance. *See Gorman*, 210 Md. at 159 ("If noise causes physical discomfort and annoyance of persons of ordinary sensibilities, tastes and habits and seriously interferes with the ordinary comfort and enjoyment of their homes, *and thus diminishes the value of the use of their property rights*, it constitutes a private nuisance.") (emphasis added); *Albright*, 443 Md. at 411 (holding that property owners who had not demonstrated interference with the use and enjoyment of their land could not recover damages for diminution in property value for nuisance).

Although Plaintiffs state in several points in their complaint that Defendants have interfered with or destroyed the "use and enjoyment" of their property, *see, e.g.*, ECF No. 1 ¶¶ 28, 42, 98, 140, 192, these are conclusory statements. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Turning to Plaintiffs' factual allegations, none actually allege a substantial interference with the use of any of Plaintiffs' own property. For example, Plaintiff Ms. Eaddy asserts that the properties bordering her home include vacated and demolished homes, ECF No. 1 ¶ 98, but does not plausibly allege that this "emptiness" has interfered with her own use or enjoyment of her property in any substantial way. *Id.* In another example, Plaintiff Mr. Walker alleges that apartment residents' use of nearby street parking "burden[s] the community," but does not include any facts about how his neighbors' parking decisions unreasonably interfere with the use and enjoyment of his own property. Other allegations refer to Plaintiff's feelings about the condition of the area (*e.g.*, embarrassment, fear). *Id.*

These allegations are not comparable to the type of interference with the use and enjoyment of one's property that is necessary to make out a private nuisance claim. *Compare, e.g.*, *Bishop Processing Co. v. Davis*, 213 Md. 465, 470, 474 (1957) (odors from a nearby processing plant that were "so bad that even though the doors and windows of [neighbors' homes] are closed, it comes into the homes causing throat irritations [and] severe headaches" "interfered seriously with the ordinary comfort and enjoyment" of appellants' properties) *with Stottlemyer v. Crampton*, 235 Md. 138, 144 (1964) (cattle driving that caused "occasional damage to grass and flowers," "the obstruction of traffic for a few minutes, the presence of manure on the highway, and the occasional tracking of it into buildings" in a rural community did not substantially interfere with the use and enjoyment of the appellees' properties) *and Albright*, 433 Md.

29

at 410 (residents near a underground gasoline leak whose wells did not test positive for contaminants did not experience a substantial interference with the use and enjoyment of their properties, notwithstanding their use of "bottled water or Brita filters, entertaining in and around their homes less than expected, reducing the frequency of use of outdoor spaces, and taking shorter showers"). *See also Nat'l Fair Housing Alliance v. Bank of America*, 401 F. Supp. 3d 619, 644 (D. Md. 2019) (holding that plaintiffs' allegations that defendant's poor property maintenance caused "water in her basement for months," "a rat-infested garage next door," "routine commotion from squatters next door," and "squirrels in their attic" raised a reasonable inference that plaintiffs "incurred serious interference with the ordinary comfort and enjoyment of their homes").

In sum, Plaintiffs have not pled sufficient facts of the type of substantial and unreasonable interference necessary to bring a private nuisance claim. Therefore, this claim must be dismissed.

### G.    Unjust Enrichment (Count 5)

As a threshold issue, Plaintiffs do not have standing to bring their unjust enrichment claim. *See Lujan*, 504 U.S. at 560 (standing requires that the alleged injury is "fairly traceable to the challenged action of the defendant") (cleaned up); *see also Bennett v. Spear*, 520 U.S. 154, 167-68 (1997) (although at the pleading stage the factual allegations may be general rather than specific, standing still requires "allegations of injury *resulting from* the defendant's conduct") (emphasis added). Plaintiffs have not adequately pled that there is a causal connection between their injuries (here, the alleged reduction in their property values, the loss of the "use and enjoyment" of their land, and the awarding of property in the neighborhood to Developer Defendants) and

the challenged action of Defendants (*i.e.*, their alleged unjust acceptance or retention of a benefit).[15] Therefore, the Court must dismiss this claim against all Defendants for lack of standing.[16]

But even if Plaintiffs could establish standing, they have failed to state a claim for unjust enrichment. Unjust enrichment is an equitable claim that serves to "deprive [a] defendant of benefits that in equity and good conscience he ought not to keep." *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295 (2007) (quoting *Dep't of Hous. & Cmty. Dev. v. Mullen*, 165 Md. App. 624, 659 (2005)). Plaintiffs allege that they have conferred on Defendants the benefit of "the market value and use of enjoyment of all of the 500 homes taken plus entire value of the neighborhood" and that Defendants' continued retention of this benefit is unjust. ECF No. 1 ¶¶ 193-201. Defendants argue that Plaintiffs did not confer any benefit upon the Defendants, or at least any benefit of the type that can give rise to an unjust enrichment claim. *See, e.g.*, ECF No. 13-1 at 29 (Developer Defendants' motion to dismiss); ECF No. 30-1 at 21 (City Defendants' motion to dismiss).

---

[15] A causal connection between injury and a defendant's actions is typically straightforward in an unjust enrichment claim, as the defendant's unjust gain comes *from* the plaintiff. *See Hill*, 402 Md. at 295 (unjust enrichment includes a "benefit conferred upon the defendant by the plaintiff"). But, as noted below, this direct causal connection is absent where the complained-of benefit is conferred by someone other than the plaintiff.

[16] The complaint does not make clear which Defendant(s) Plaintiffs brings their unjust enrichment claims against. *Compare* ECF No. 1 at 56 ("Individual Plaintiffs . . . have conferred on the *Developer and City* a benefit") (emphasis added) *with id.* at 57 (stating that "Defendants," meaning all named defendants, "retain this benefit"). For completeness, the Court considers this claim as one brought against each Defendant.

"Unjust enrichment consists of three elements: 1. A benefit conferred upon the defendant by the plaintiff; 2. An appreciation or knowledge by the defendant of the benefit; and 3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Hill*, 402 Md. at 295.

Plaintiffs have not made out an unjust enrichment claim because they have not alleged the first element, *i.e.*, that there was a "benefit conferred upon the defendant *by the plaintiff*." *Id.* (emphasis added). As to Plaintiffs' claim that they have conferred the "market value and use [and] enjoyment of all of the 500 homes taken plus entire value of the neighborhood," ECF No. 1 ¶ 194, no Individual Plaintiffs have alleged that they conveyed value to any Defendant; Plaintiffs concede they have maintained ownership of their properties, as their homes are not within the LDDA area. Defendant Poppleton Now likewise has not made out an unjust enrichment claim because the complaint does not establish that the organization, or any of its members, conveyed any benefit to any Defendant.[17] As to Plaintiffs' claim that Developer Defendants have been unjustly enriched "in the form of $810,000 plus interest plus any other public monies he has been paid," ECF No. 1 ¶ 201, that claim likewise fails because it was HABC and the City Defendants—not the Plaintiffs—who conferred this alleged financial benefit. *See id.* ¶ 106 (alleging that HABC paid Developer Defendants $550,000 in "public money" to allow the City to redevelop parcels included in Phase IV of the LDDA); *id.* ¶ 104 (alleging

---

[17] While Plaintiffs state that Poppleton Now "advocates for . . . past tenants of the Poppleton neighborhood (whose homes were taken)," ECF No. 1 ¶ 148, they do not allege that any of the organization's members had their property taken by eminent domain.

that the City Defendants paid Developer Defendants the market value of Ms. Eaddy's two properties, $260,000, to remove them from the LDDA area); *see also* ECF No. 1-10 at 2. For these reasons, Plaintiffs' unjust enrichment claim does not state a claim on which relief can be granted.

### H.     Developer Defendants' motion for sanctions

Developer Defendants also filed a motion for sanctions against Plaintiffs and their counsel. *See* ECF No. 18. The motion asserts that the complaint is "legally frivolous" and "disregard[s] . . . elementary standing requirements," which Developer Defendants contend show that "Plaintiffs' counsel failed to conduct a reasonable inquiry into the law and facts before filing suit, violating [Federal Rule of Civil Procedure] 11(b)." *Id.* at 1-2. Developer Defendants request "appropriate sanctions" in the form of dismissal with prejudice and payment of their reasonable attorney's fees and costs. *Id.* at 11.

Federal Rule of Civil Procedure 11(c) allows for sanctions when an attorney submits a complaint that includes claims or legal contentions that are not warranted by either existing law or a nonfrivolous argument for "extending, modifying, or reversing existing law." *See* Fed. R. Civ. P. 11(b), (c). Here, although the Court ultimately finds that Plaintiffs lack standing to bring these claims and have failed to state claims on which relief can be granted, the filing of the complaint does not rise to the level of sanctionable activity under Rule 11. *See Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 151 (4th Cir. 2002) ("[I]t is axiomatic that asserting a *losing* legal position, even one that fails to survive summary judgment, is not of itself sanctionable conduct."); s*ee also Cleveland Demolition Co., Inc. v. Azcon Scrap Corp.*, 827 F.2d 984, 988 (4th Cir. 1987) ("Rule [11] does not seek to stifle the exuberant spirit of skilled advocacy . . . [but] attempts to

discourage the needless filing of groundless lawsuits."). The Court will, therefore, deny Developer Defendants' motion for sanctions.

## IV.    CONCLUSION

For the foregoing reasons, the Court will dismiss Plaintiffs' complaint and deny Developer Defendants' motion for sanctions. An appropriate order follows.


Date:  June 17, 2025                              _____/s/_____
                                                 Adam B. Abelson
                                                 United States District Judge